UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| DIGITECH COMPUTER, INC., | ) |
| Plaintiff, | ) |
| v. | ) 2:07-cv-225-WGH-RLY |
| TRANS-CARE, INC., | ) |
| Defendant. | ) |
| TRANS-CARE, INC., | ) |
| Counter Claimant, | ) |
| v. | ) |
| DIGITECH COMPUTER, INC., | ) |
| Counter Defendant. | ) |

**ENTRY ON PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**Introduction**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge,[1] on Plaintiff Digitech Computer, Inc.'s ("Digitech") Motion for Summary Judgment filed August 20, 2008.  (Docket Nos. 26-28). Defendant Trans-Care, Inc. ("Trans-Care") filed a Response on September 22,

---

[1] In their Case Management Plan filed December 18, 2007, the parties consented to Magistrate Judge jurisdiction in this case.  (Docket No. 12).  District Judge Richard L. Young entered an Order of Reference on January 4, 2008.  (Docket No. 14).

2008.  (Docket Nos. 31-32).  Digitech filed its Reply on October 6, 2008.  (Docket Nos. 33-34).

## **Background**

Trans-Care is a Terre Haute, Indiana company principally involved in medical transportation; they provide services which include emergency ambulance and non-emergency patient transportation, mainly in west central and central Indiana.  Digitech is a provider of ambulance and medical transportation software, which includes both dispatch and billing functions. (Counterclaim ¶¶ 1-2).

Zoll Data Systems ("Zoll") is a major competitor in the ambulance dispatch and billing software field; Digitech is a newer competitor in this software field. (Affidavit of Faril Ward ("Ward Aff.") ¶ 8).  In 2005, Trans-Care determined to replace and/or upgrade its existing Zoll ambulance dispatch and billing software. (*See* Counterclaim ¶ 3).

In the fall of 2005, Gabriella Rubino ("Rubino"), a Digitech employee involved in Development and Support, and Marty McNellis ("McNellis"), Digitech's Vice President of Business Affairs, met Trans-Care's Vice President of Operations, Faril Ward ("Ward"), at a trade show.  (Deposition of Gabriella Rubino ("Rubino Dep.") at 8, 20-21).

After the trade show meeting, on February 3, 2006, McNellis provided Trans-Care owner Russell Ferrell ("Ferrell")  with an unsigned formal proposal ("the Formal Proposal") detailing the services that Digitech could supply to

Trans-Care. (Counterclaim at Ex. 1). Included in the Formal Proposal was a 90-day "satisfaction guarantee" provision which is at the center of this contractual dispute. The "satisfaction guarantee" and 90-day trial period was proposed as follows:

> **Satisfaction Guaranteed**
>
> We've built our business on the satisfaction of our clients. During the first 90 days of the contract we will work closely with your organization to make sure that all of our systems are fine-tuned exactly as you would like to see them. During this 90 day period you will only be billed for programming charges at $75.00 per hour. If, after 90 days you are not completely satisfied with the integrated system, you owe none of the monthly charges and are free to go, having paid only the minimal custom programming charges, if any. Should you be happy with the system, your monthly charges will begin on the fourth month of the contract. We're only happy when our customers are happy and this policy ensures your complete satisfaction.

(*Id.*) The Formal Proposal further provided that the 90-day "satisfaction guarantee" would start after the completed Digitech software system had been placed in operation, as provided at page 5 of the Formal Proposal:

> Our suggestion is to utilize our E-PCR, which is included in the monthly all-inclusive fee, *after the completion of our risk free 90 day trial period which is explained below. Once you've had 90 days to evaluate the completed system and assuming you decided to stay with us*, we will then either begin implementation of our E-PCR into your system, or integrate any other field data collection system you might choose.

(*Id.* (emphasis added)).

According to Ward, the "satisfaction guarantee" provision "was a determinative factor in Trans-Care's decision to enter into the Agreement to license and use the Digitech software and related services." (Ward Aff. ¶ 9).

-3-

McNellis admitted that this language was specifically used to solicit Trans-Care's business:

> Q    Do you know why it was, that the satisfaction guaranteed language . . . was added to the Trans-Care proposal?
> A    At the time, it was an inducement.
> Q    Was it an inducement that was normally not offered to other potential new customers of Digitech, based on your knowledge?
> A    I had not offered it to other customers.
> Q    Why did you offer it to Tans-Care in this case?
> A    As an inducement.
> Q    An inducement for what?
> A    For them to buy our software.

(Deposition of Martin P. McNellis ("McNellis Dep.") at 35). The 90-day "satisfaction guarantee" was offered to Trans-Care because it was a current Zoll customer. (Deposition of Mark Schiowitz ("Schiowitz Dep.") at 43). Digitech president Mark Schiowitz ("Schiowitz") admits that the Formal Proposal was the only *formal* proposal submitted by Digitech. (*Id.* at 66). Furthermore, McNellis admitted that he had never told anyone at Trans-Care that the "satisfaction guarantee" in the Formal Proposal was being withdrawn. (McNellis Dep. at 37-38). Nor did he know of anyone at Digitech who had ever done so. (*Id.* at 38).

At a February 16, 2006 meeting between the parties at Digitech's Briarcliff Manor, New York offices, Schiowitz reiterated to Ward and Ferrell that there was a 90-day "satisfaction guarantee," exclaiming that "[i]f you don't like it in 90 days, give it back to us." (Ward Aff. ¶¶ 4, 7). Schiowitz claims he could not recall whether the "satisfaction guarantee" had been discussed at this meeting. (Schiowitz Dep. at 67, 69).

Despite admissions that there was only one formal proposal, Digitech argues that a second proposal was sent to Trans-Care by McNellis in an exchange of e-mail messages. Digitech claims that this alleged proposal no longer contained the "satisfaction guarantee." (*See* Plaintiff's Brief in Support of Motion for Summary Judgment at Ex. 8). However, an examination of these e-mail communications from McNellis to Ferrell reveals the following language:

> All installation, training and programming charges will be billed monthly as they accrue over the initial 90 days of the contract. Remember that we will not begin billing you for the monthly "all-maintenance" fee until the beginning of the fourth month of the contract, *after you are satisfied that the call-taking, dispatch, billing and paging system works to your complete satisfaction.*

(Plaintiff's Brief in Support of Motion for Summary Judgment at Ex. 8 (emphasis added).

On May 10, 2007, Trans-Care prepared and forwarded to Digitech a Purchase Order for the Digitech software. Within the Purchase Order was a paragraph that incorporated the Formal Proposal. (Response at Ex. 1). Specifically, the Purchase Order contained the following conditions:

1. Any Deviation from this purchase order and/or the above and below referenced attachments must be approved in advance by the President of Trans-Care or his designee.
2. Trans-Care has relied exclusively upon the advice and expertise of Digitech Computer, Inc. for the specification and application of this system. Therefore Trans-Care relies upon the implied warranty of Digitech Computer, Inc. that the system installed will meet all specifications of the system proposed by Digitech and will fulfill all requirements and specifications as represented in the Agreement, proposal and clarification of Digitech Computer, Inc. to Trans-Care.
3. *The Proposal and clarifications of Digitech are attached to this purchase order and incorporated herein.*

(Response at Ex. 1 (emphasis added); *see also* Ward Aff.). This Purchase Order was not signed by Digitech. (Deposition of Faril Ward ("Ward Dep.") at 86).

At the same time, Digitech submitted to Trans-Care a contract for Trans-Care to purchase/license Digitech's software. (Complaint at Ex. A). The "contract" appears to consist of two separate, independently-signed agreements. The first agreement runs from pages 1 through 7, with signature lines at the end of page 7. This first agreement ("the Product/Services Agreement") contains the actual provisions for the sale and licensing of the Digitech software to Trans-Care for a period of three years. The second agreement is labeled as "Rider B - Business Associate Agreement." It addresses issues regarding the sharing of confidential patient information under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"). (*Id.*) The Business Associate Agreement runs from pages 11 to 18, with signature lines contained at the bottom of page 18.[2] While both the Product/Services Agreement and Business Associate Agreement contain an effective date of May 8, 2006, both agreements were signed by Trans-Care on May 20, 2006[3] and Digitech on May 23, 2006. (*Id.*) Both the Product/Services Agreement and Business Associate

---

[2] The page numbers upon the document read "_ of 19." However, it is undisputed that the document only consists of 18 pages, the last of which is "18 of 19." (Ward Dep. at 84).

[3] The court is aware that Digitech contends that the agreements were signed by Ferrell on May 10, but having examined the document, in the light most favorable to Trans-Care, the agreements were not signed until May 20.

Agreement were prepared by Digitech, who used its own attorneys.[4] (Schiowitz Dep. at 66-67).

Section VI A of the Product/Services Agreement provides:

A. No provision of this Agreement shall be deemed waived, amended or modified by either party unless such waiver, amendment or modification be in writing, signed by the party against whom it is sought to enforce the waiver, amendment or modification.

(Complaint at Ex. A). Additionally, the Business Associate Agreement contains a paragraph entitled "*Primacy*" that explains: "To the extent that any provisions of this Agreement conflict with the provisions of any other agreement or understanding between the parties, this Agreement shall control *with respect to the subject matter of this Agreement.*" (*Id.* (emphasis added)). There is no language contained within either agreement specifically stating that the parties intended that their prior written and/or verbal agreements or negotiations be merged into the contract; that the Agreements constituted the entire and complete agreements between the parties; or that neither party was relying upon any prior representations made. (*See id.*).

Trans-Care "went live" with the completed Digitech software at midnight on January 1, 2007. Immediately, Trans-Care incurred substantial, continuing,

---

[4]Ward negotiated the contract terms with Digitech and changes were made to an initial draft as a result of those negotiations. (Ward Dep. at 65-74; Schiowitz Dep. at 144-45; Counterclaim at Ex. 1; Plaintiff's Brief in Support of Motion for Summary Judgment at Exs. 9-12). Ward acknowledged understanding the importance of the contract language so that everyone would know what's expected of them. (Ward Dep. at 74-83; Plaintiff's Brief in Support of Motion for Summary Judgment at Ex. 12).

and intractable problems with the Digitech software, including both its dispatch and billing functions. In early February 2007, Trans-Care began internal discussions regarding whether to continue with Digitech. (Brief in Support of Motion for Summary Judgment at Ex. 13). In a letter dated March 1, 2007, Trans-Care provided written notice to Digitech of its decision to terminate the use of the Digitech software and exercise the 90-day "satisfaction guarantee" warranty rights. (Response at Ex. 6). Trans-Care did not pay any then outstanding invoices or any of the further financial obligations under the Contract. Digitech refused to honor the 90-day "satisfaction guarantee."

Ultimately, Digitech initiated this lawsuit through the filing of its Complaint for Damages in the Vigo Superior Court on July 23, 2007. In its Complaint, Digitech sought damages consisting of its fees which it claimed to be due and owing for the entire three year length of the Product/Services Agreement. After removal of this action to federal court, Trans-Care filed its Answer and Counterclaim on November 24, 2007. Trans-Care's Counterclaim consists of five counts. Count I seeks damages for breach of contact; Count II makes a claim for breach of express warranties; Count III presents a claim for breach of implied warranties; Count IV is a claim for fraud in inducing Trans-Care to enter into the Agreements with Digitech; and Count V is a claim for punitive damages.

Digitech filed its Motion for Summary Judgment arguing that all prior negotiations and writings were merged and integrated into the "contract," and,

therefore, that it is entitled to summary judgment on its breach of contract claim.  Furthermore, Digitech argues that part of Trans-Care's Counterclaim alleging fraud and seeking punitive damages should be dismissed because Trans-Care has not proved all elements of its claim of fraud.  In its Response, Trans-Care argues that there was no integration clause within the "contract," that the "satisfaction guarantee" amounted to a fraudulent inducement, and that Digitech's Motion for Summary Judgment must be denied.  Having examined the parties' arguments and the relevant law, the court concludes that Digitech's Motion for Summary Judgment is **DENIED** with regard to the Breach of Contract claim and is **GRANTED** with regard to Counts IV and V of Trans-Care's Counterclaim asserting claims of Fraud and Punitive Damages.

### Summary Judgment Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id.* at 255. If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999). Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## **Discussion**

This is a suit based on the court's diversity jurisdiction. And, while a federal court sitting in diversity jurisdiction shall apply its own procedural laws, it must apply the substantive laws of the state in which it sits. *First Nat. Bank and Trust Corp. v. American Eurocopter Corp.,* 378 F.3d 682, 689 (7th Cir. 2004). The court must, therefore, apply Indiana substantive law. However, '[i]f the laws of more than one jurisdiction arguably are in issue, *Erie* also requires a federal court to apply [the forum] state's choice of law rules." *Jean v. Dugan,* 20 F.3d 255, 260-61 (7th Cir. 1994). Thus, the court must apply Indiana's choice of law rules.

In Indiana, choice of law rules in the area of contracts call for the court to apply the law of the place with the "most intimate contacts" or "most significant relationship." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.,* 28

F.3d 572, 581 (7th Cir. 1994). The Supreme Court of Indiana, in *W.H. Barber Co. v. Hughes,* indicated that this test requires the court to examine "all acts of the parties touching the transaction in relation to the several states involved," and follow "the law of that state with which the facts are in most intimate contact." *W.H. Barber Co. v. Hughes,* 63 N.E.2d 417, 423 (Ind. 1945). In determining which state has the most intimate contacts, the list of factors that courts in Indiana are to consider includes: (1) the place of contracting; (2) the place where contract negotiations occurred; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the location of the parties. *Employers Ins. of Wausau v. Recticel Foam Corp.,* 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).

While the parties failed to brief the court on the choice of law issue, it is apparent from the parties' briefs that enough intimate contacts point to the application of Indiana law to this dispute as a great deal of contract negotiations occurred in Indiana; the contract involves Trans-Care, which is an Indiana company; and the subject matter of the contract is computer software that covers ambulance services provided in Indiana. Because no other argument has been made that some other state's law applies, and because Indiana's choice of law rules point toward the application of Indiana contract law, the court concludes that Indiana law must be applied to this contract dispute.

In this case, the contract dispute between the two parties centers around whether or not Digitech and Trans-Care intended for the Product/Services

Agreement and the Business Associate Agreement to be a completely integrated agreement. A writing intended to be a final and complete agreement between two parties is an integration. *Franklin v. White,* 493 N.E.2d 161, 166 (Ind. 1986). Indiana law explains that:

> In general, where the parties to an agreement have reduced the agreement to a written document and have included an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract.

*Truck City of Gary, Inc. v. Schneider Nat. Leasing,* 814 N.E.2d 273, 278 (Ind. Ct. App. 2004). For language in a contract to meet the definition of an integration clause, it must explain that all *prior* negotiations, representations, and communications are withdrawn, annulled, or merged into the final written agreement. *Lawlis v. Kightlinger & Gray,* 562 N.E.2d 435, 439 n.1 (Ind. Ct. App. 1990).

An integration clause does not always control whether or not the parties intended a writing to be a completely integrated agreement. *Franklin,* 493 N.E.2d at 166. A court must examine all of the relevant evidence to determine if the parties intended a writing to be totally integrated. *Id.* However, even if the parties to a contract included an integration clause, the parol evidence rule does not prohibit consideration of extrinsic evidence: (a) to show that fraud, unintentional misrepresentation, or mistake led to formation of the contract; (b) to show the nature of the consideration supporting a contract; (c) to apply the

terms of the contract to its subject matter; and (d) to uncover the circumstances under which the parties entered into the written contract. *Millner v. Mumby,* 599 N.E.2d 627, 629 (Ind. Ct. App. 1992).

When a determination has been made by a court that there was no integration, a different set of rules apply. Under those circumstances, parol evidence may be admitted to supply an omission in the terms of the contract. *Malo v. Gilman,* 379 N.E.2d 554, 557 (Ind. Ct. App. 1978).

Additionally, it is important to note that the Seventh Circuit has explained that the initial decision of whether or not the parties intended a complete integration is a question of law for the court. *Utica Mut. Ins. Co. v. Vigo Coal Co., Inc.,* 393 F.3d 707, 714 (7th Cir. 2004). But, once the court has determined that the agreement was not a complete integration, "the case go[es] to the jury . . . for a determination, based on extrinsic evidence as well as the written contract–based in short on all relevant, admissible evidence–of what the contract really means." *Id.*

In this instance, there is ample evidence to demonstrate that the parties did not intend a complete integration. There was no integration clause. Digitech has been unable to point to any language in either the Product/ Services Agreement or the Business Associate Agreement that expressed an intention to withdraw, annul, or merge all prior negotiations, representations, and communications into the final written agreement. Neither the paragraph entitled "*Primacy*" in the Business Associate Agreement nor Section VI A in the

Product/Services Agreement contained language tantamount to an integration clause. Additionally, language in the Product/Services Agreement specifically references "other specifications and documentation" supplied by Digitech. Specifically, it provides:

> Subject to the terms and conditions set forth herein, Digitech hereby grants [Trans-Care] a non-exclusive, non-transferable license to use the Software. DIGITECH represents and warrants that the Software shall function as designed in accordance with this Agreement (including any Riders hereto) and the specifications and documentation supplied by DIGITECH in all material respects.

(Complaint at Ex. A). Given the reference to writings outside of the Product/Services Agreement, and given the fact that Digitech drafted the agreement, this is additional substantial evidence that Digitech did not intend a complete integration. Finally, extrinsic evidence clearly demonstrates that Trans-Care did not intend a complete integration. After the Product/Services Agreement and the Business Associate Agreement's effective date of May 8, 2006, Trans-Care submitted a Purchase Order that unambiguously incorporates the Formal Proposal, including the 90-day "satisfaction guarantee." Trans-Care's actions reveal an intention to include the 90-day "satisfaction guarantee" as an essential term of the parties' agreement.[5]

---

[5] Even if the court were to conclude that the parties intended a complete integration, Indiana law still permits the use of extrinsic evidence to demonstrate that fraud, unintentional misrepresentation, or mistake led to formation of the contract. Here, Trans-Care has provided extrinsic evidence (in the form of the written Formal Proposal, deposition testimony, and a Purchase Order) that supports its argument that it was operating under the assumption that a 90-day "satisfaction guarantee" was a part of the parties' agreement.

In light of the fact that there was no integration clause and substantial evidence to suggest that the parties did not intend a complete integration, the court concludes that this issue must go to a jury to determine what the contract means based on all admissible evidence including the writings and extrinsic evidence.[6]

Digitech also seeks summary judgment on Count IV of Trans-Care's Counterclaim asserting fraud and Count V requesting punitive damages. In Indiana, the elements of an actual fraud claim include:

(1) a material representation of past or existing fact which

(2) was false,

(3) was made with knowledge or reckless ignorance of its falsity,

(4) was made with the intent to deceive,

(5) was rightfully relied upon by the complaining party,

(6) proximately caused injury to the complaining party.

*Bilimoria Computer Systems, LLC v. America Online, Inc.,* 829 N.E.2d 150, (Ind. Ct. App. 2005). Furthermore, "actual fraud may not be based on representations of future conduct, on broken promises, or on representations of existing intent that are not executed." *Id.*

---

[6]Digitech argues in its Reply Brief that it should be granted summary judgment even if there was a 90-day "satisfaction guarantee" because Trans-Care has failed to demonstrate that it was not given the full 90 days contemplated to try out Digitech's software. However, Digitech is incorrect, because there are still genuine issues of material fact regarding whether there was a breach of such a 90-day "satisfaction guarantee."

Examining the facts surrounding this dispute, the court concludes that at least one essential element is lacking from Trans-Care's claim of fraud. Trans-Care claims that Digitech's representations concerning the 90-day "satisfaction guarantee" amounted to fraud. However, not honoring the 90-day satisfaction guarantee is nothing more than a broken promise. Such a broken promise does not rise to the level of fraud under Indiana law. Because Trans-Care's fraud claim must fail, its claim seeking punitive damages must also fail. When a party seeking punitive damages asserts both claims of fraud and breach of contract, the party must prove the independent tort of fraud in order to be entitled to an award of punitive damages. *Tobin v. Ruman,* 819 N.E.2d 78, 86 (Ind. Ct. App. 2004).

## Conclusion

For the reasons outlined above, Digitech's Motion for Summary Judgment is **GRANTED, in part, and DENIED, in part.** Counts IV and V of Trans-Care's Counterclaim asserting claims of Fraud and Punitive Damages are **DISMISSED.** The remaining counts of the Counterclaim remain to be resolved.

**SO ORDERED.**

**Dated:** October 14, 2008

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Mark Douglas Hassler
HUNT HASSLER & LORENZ, LLP
hassler@huntlawfirm.net

Jeffry Alan Lind
COX ZWERNER GAMBILL & SULLIVAN
jeff@fleschnerlaw.com