UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DIGITECH COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counter Defendant, | ) | |
| | ) | |
| v. | ) | 2:07-cv-225-WGH-RLY |
| | ) | |
| TRANS-CARE, INC., | ) | |
| | ) | |
| Defendant and | ) | |
| Counter Claimant. | ) | |

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND DECISION**

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, pursuant to the consent of the parties and the Order of

Reference dated January 4, 2008.  (Docket Item 13).  A bench trial was held

before the Magistrate Judge on July 8-10, 2009.  Plaintiff was represented by

counsel, Jeffry Alan Lind; Defendant was represented by counsel, Mark Douglas

Hassler.

The Court, having heard all of the testimony and reviewed all of the

evidence, now enters the following Findings of Fact, Conclusions of Law, and

Decision:

**Findings of Fact**

1.  Trans-Care, Inc. ("Trans-Care") is an Indiana corporation based in

Terre Haute, Indiana.  Trans-Care is principally involved in medical

transportation; they provide services, which include emergency ambulance and non-emergency patient transportation, mainly in west central and central Indiana.  (Exhibit 1; Counterclaim § 1).  Digitech Computer, Inc. ("Digitech") is a New York corporation with its principal place of business in Briarcliff Manor, New York.  Digitech is a provider of ambulance and medical transportation software, which includes both dispatch and billing functions.  (Exhibit 1; Counterclaim ¶ 2).

2.  In 2005, Trans-Care determined to replace and/or upgrade its existing ambulance dispatch and billing software (referred to by its provider's name, "Zoll").

3.  In the fall of 2005, Gabriella Rubino, a Digitech employee involved in Development and Support, and Marty McNellis, Digitech's Vice President of Business Affairs, met Trans-Care's Vice President of Operations, Faril Ward, at a trade show.  (Testimony of Ward, McNellis, and Rubino).

4.  On February 3, 2006, after the trade show meeting, Mr. McNellis provided Trans-Care's President, Russell Ferrell, with an unsigned formal proposal ("Formal Proposal") detailing the services that Digitech could supply to Trans-Care.  (Exhibit 108).

5.  The Formal Proposal included a 90-day "Satisfaction Guaranteed" provision which is at the center of this contractual dispute.  The satisfaction guarantee and 90-day trial period was proposed as follows:

**Satisfaction Guaranteed**

We've built our business on the satisfaction of our clients.  During the first 90 days of the contract we will work closely with your organization to make sure that all of our systems are fine-tuned exactly as you would like to see them.  During this 90 day period you will only be billed for programming charges at $75.00 per hour.  If, after 90 days you are not completely satisfied with the integrated system, you owe none of the monthly charges and are free to go, having paid only the minimal custom programming charges, if any.  Should you be happy with the system, your monthly charges will begin on the fourth month of the contract. We're only happy when our customers are happy and this policy ensures your complete satisfaction.

(*Id.* at 7).

6.  The Formal Proposal further provided that the 90-day satisfaction guarantee would start after the completed Digitech software system had been placed in operation, as follows:

Our suggestion is to utilize our E-PCR, which is included in the monthly all-inclusive fee, *after the completion of our risk free 90 day trial period which is explained below.  Once you've had 90 days to evaluate the completed system and assuming you decided to stay with us*, we will then either begin implementation of our E-PCR into your system, or integrate any other field data collection system you might choose.

(*Id.*  at 5 (emphasis added)).

7.  According to Mr. Ward, the "Satisfaction Guaranteed" provision was a determinative factor in Trans-Care's decision to enter into an agreement to license and use the Digitech software and related services.  (Ward Testimony).

8.  Digitech crafted this language in the Formal Proposal specifically to solicit Trans-Care's business; it was not part of the standard terms given to all other customers.  (McNellis Testimony).

-3-

9.  After the Formal Proposal, the parties met at Digitech headquarters in New York to continue their negotiations.  At a February 16, 2006 meeting between the parties at Digitech's Briarcliff Manor, New York offices, Mark Schiowitz, Digitech's President, reiterated to Mr. Ward and Mr. Ferrell that there was a 90-day satisfaction guarantee, exclaiming that "[i]f you don't like it in 90 days, give it back to us." (Ward Testimony).

10.  On February 21, 2006, a revised Formal Proposal summarizing the parties' earlier negotiations was prepared by Digitech.  (Exhibit 76).

11.  The parties continued discussing certain terms, and the negotiations culminated in the first draft of an agreement on April 21, 2006.  (Exhibit 6).

12.  On April 26-27, 2006, the parties continued to negotiate the terms of the agreement in a series of emails.  (Exhibits 116-117).

13.  Michael Manion of Digitech prepared a final draft of the agreement ("Final Agreement"), which was dated May 8, 2006, and directed it to Trans-Care.  (Exhibit 1).

14.  The Final Agreement was signed by Mr. Ferrell on May 10, 2006.

15.  The signed Final Agreement was sent back to Digitech in the same envelope with a Purchase Order signed by Mr. Ferrell on May 10, 2006.  (Exhibit 111).

16.  The May 10, 2006 Trans-Care Purchase Order contained the following conditions:

1.     Any Deviation from this purchase order and/or the above and below referenced attachments must be approved in advance by the President of Trans-Care or his designee.

2.     Trans-Care has relied exclusively upon the advice and expertise of Digitech Computer, Inc. for the specification and application of this system. Therefore Trans-Care relies upon the implied warranty of Digitech Computer, Inc. that the system installed will meet all specifications of the system proposed by Digitech and will fulfill all requirements and specifications as represented in the Agreement,  and clarification of Digitech Computer, Inc. to Trans-Care.

3.     *The Proposal and clarifications of Digitech are attached to this purchase order and incorporated herein.*

(*Id.* (emphasis added)).

17. On May 15, 2006, Digitech received the signed Final Agreement, along with Trans-Care's Purchase Order.

18. Digitech's Mr. Manion did not forward Trans-Care's Purchase Order to Mr. Schiowitz, and neither Mr. Schiowitz nor any other authorized agent of Digitech signed the Purchase Order after its receipt by Digitech.

19. Mr. Schiowitz did not sign the Final Agreement until May 23, 2006.

20. The Final Agreement consists of two separate, independently-signed documents.  The first document runs from pages 1 through 10, with signature lines at the end of page 7.  This first document ("Product/Services Agreement") contains the actual provisions for the sale and licensing of the Digitech software to Trans-Care for a period of three years, along with "Rider A – Description of Software Modules, Services, Fees & Client Responsibilities."  The second document is entitled, "Rider B – Business Associate Agreement."  It addresses

issues regarding the sharing of confidential patient information under the Health Insurance Portability and Accountability Act of 1996 (HIPPA).  The Business Associate Agreement runs from pages 11 to 18, with signature lines at the bottom of page 18.[1]

21.  Under the Product/Services Agreement, at paragraph I-A, Digitech was required to provide "the software modules and services specified in Rider A – Description of Software Modules, Services, Fees & Client Responsibilities." (Exhibit 1).  Digitech provided to Trans-Care all seven modules listed at paragraph II-A of Rider A.

22.  Digitech provided the fees/training services found in Rider A at paragraph III, which could be done in person or via telephone.  Paragraph III of Rider A provides that training will be "approximately five (5) days."  (*Id.*)  Digitech provided telephone training and four days of on-site training by two individuals, which amounts to "approximately five (5) days" of training.  (Testimony of Rubino).

23.  At paragraph III-A of the Product/Services Agreement, Digitech "represents and warrants that the *Software* shall function as designed in accordance with this Agreement (including any Riders hereto) and the specifications and documentation supplied by DIGITECH in all material respects."  (Exhibit 1 (emphasis added)).

---

[1]The page numbers upon the document read "_ of 19."  However, it is undisputed that the document only consists of 18 pages, the last of which is "18 of 19."  (Ward Dep. at 84).

24.   The call-taking and dispatch standard system and the billing standard system allowed Trans-Care to bill and to dispatch commencing on the agreed-upon go live date of January 1, 2007.

25.   While Trans-Care's dispatch and billing systems experienced difficulties between January 1 and March 1, 2007, those difficulties, as described by Mr. Lloyd and Ms. Bennett, were haphazard, never occurred on the same machine, and did not occur with each and every use of the software.  The testimony before the Magistrate Judge is that defects in software can be recreated, but defects related to hardware, or interface between multiple layers of software, can seldom be recreated.  The burden of proof is upon Trans-Care to show that the modules were defective and did not perform according to the specifications.  The evidence establishes that some hardware was not available to allow the PTF function to occur; that Trans-Care had admitted problems with its IT provider, "BA"; and that many problems related to lack of familiarity and use by Trans-Care employees.  Trans-Care has failed to prove that the failures which occurred and were not remedied were as the result of defective *software*.

26.   The fact that the Digitech software turned out to be more cumbersome to use or did not work perfectly on each occasion does not establish that the software itself was defective.

27.   Paragraph V-B of the Product/Services Agreement provides:  "Either party may, upon ninety (90) days written notice identifying specifically the basis for such notice, terminate this agreement for breach of a material term or

condition . . ., provided that the party in breach shall not have cured such breach, or taken substantial steps toward curing such breach within the ninety (90) day period." (*Id.* at 4-5).

28. The purported notice to terminate letter (Exhibit 16) does not comply with the Product/Services Agreement, at paragraph V-B, because it does not identify specifically the breach of a material term or condition and provide to Digitech the right to cure such breach.

29. The Product/Services Agreement, at paragraph VI-A, provides:

> No provision of this Agreement shall be deemed waived, amended or modified by either party unless such waiver, amendment or modification be in writing, signed by the party against whom it is sought to enforce the waiver, amendment or modification.

(*Id.* at 5).

30. Additionally, the Business Associate Agreement contains a paragraph entitled "*Primacy*" that explains: "To the extent that any provisions of this Agreement conflict with the provisions of any other agreement or understanding between the parties, this Agreement shall control *with respect to the subject matter of this Agreement*." (*Id.* at 18 (emphasis added)).

31. There is no language contained within either the Product/Services Agreement or the Business Associate Agreement specifically stating that the parties intended that their prior written and/or verbal agreements or negotiations be merged into the Final Agreement. Neither is there any explicit language that these two Agreements constituted the entire and complete

agreements between the parties, nor that either party was relying upon any prior representations made.  (*See* Exhibit 1).

32.  The fact that the Final Agreement between the parties does not contain a merger clause is not determinative in this case because there were no final agreements clearly accepted by both parties in existence prior to the time that Mr. Ferrell signed the Final Agreement on May 10, 2006.

33.  The Purchase Order does not amount to a modification or amendment of the Final Agreement under paragraph VI-A because it was not signed by Digitech, the party against whom it sought to enforce.

34.  Digitech is entitled to payments under the Final Agreement for 33 months in the following amounts:

(a)  $4,199.33 for requested customization;
(b)  $2,256.75 for requested training;
(c)  $95,700.00 for 33 monthly fees;
(d)  interest at 1-1/2% per month from the date of thirty (30) days after each invoice; and
(e)  reasonable attorney's fees which will be determined by the Court.

35.  With respect to Trans-Care's counterclaims, the Court finds as follows:

(a)  Count I, Breach of Contract:  For the reasons specified above, Trans-Care has failed to prove that Digitech's ambulance commander software failed to comply with the terms of its contract and has failed to establish that Digitech's proposals are contracts which are enforceable under Indiana law.

(b)  Count II, Breach of Express Warranty:  The Court concludes that the "Satisfaction Guaranteed" express warranty contained within Digitech's proposals is not enforceable because it was a warranty never agreed upon expressly by Digitech in the Final Agreement between the parties.

(c)     Count III, Breach of Implied Warranty:  For the reasons
specified above, Trans-Care has failed to prove that Digitech's
ambulance commander software and related services were not
of merchantable quality or were unfit and unusable for the
purpose for which it was intended.

## Conclusions of Law

1.  This is a suit based on the Court's diversity jurisdiction.  Digitech is a
New York corporation with its principal place of business in New York.  Trans-
Care, Inc., is an Indiana corporation with its principal place of business in
Indiana.  More than $75,000 is at issue in this litigation.  While a federal court
sitting in diversity jurisdiction shall apply its own procedural laws, it must apply
the substantive laws of the state in which it sits.  *First Nat. Bank and Trust Corp.
v. American Eurocopter Corp.,* 378 F.3d 682, 689 (7th Cir. 2004).  The Court
must, therefore, apply Indiana substantive law.

2.  However, "[i]f the laws of more than one jurisdiction arguably are in
issue, *Erie* also requires a federal court to apply [the forum] state's choice of law
rules." *Jean v. Dugan,* 20 F.3d 255, 260-61 (7th Cir. 1994).  Thus, the Court
must apply Indiana's choice of law rules.

3.  In Indiana, choice of law rules in the area of contracts call for the Court
to apply the law of the place with the "most intimate contacts" or "most
significant relationship." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de
C.V.,* 28 F.3d 572, 581 (7th Cir. 1994).  The Supreme Court of Indiana, in *W.H.
Barber Co. v. Hughes,* indicated that this test requires the Court to examine "all
acts of the parties touching the transaction in relation to the several states

-10-

involved," and follow "the law of that state with which the facts are in most intimate contact." *W.H. Barber Co. v. Hughes,* 63 N.E.2d 417, 423 (Ind. 1945).

4.   In determining which state has the most intimate contacts, the list of factors that courts in Indiana are to consider includes:  (1) the place of contracting; (2) the place where contract negotiations occurred; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the location of the parties.  *Employers Ins. of Wausau v. Recticel Foam Corp.,* 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).

5.   Enough contacts point to the application of Indiana law to this dispute; a great deal of contract negotiations occurred in Indiana; the contract involves Trans-Care, which is an Indiana company; and the subject matter of the contract is computer software that was to apply to ambulance services provided in Indiana.  Because no other argument has been made that some other state's law applies, and because Indiana's choice of law rules point toward the application of Indiana contract law, the Court concludes that Indiana law must be applied to this contract dispute.[2]

---

[2]The Product/Services Agreement, at paragraph VI-B, also provides a forum selection clause which states:

> This Agreement shall not cede governance over points of law to either party but shall be construed and the rights and liabilities of the parties hereto determined in accordance with the internal laws of the state of corporate residence of the Defendant in any action, not withstanding that either party may or may not become at some future date the resident of another state.

Defendant in this case has its state of corporate residence in Indiana.  Neither party argued that the Counterclaim required application of New York law because Digitech is domiciled in New York.

6.  In this case, the contract dispute between the two parties centers around whether or not Digitech and Trans-Care intended for the Product/Services Agreement and the Business Associate Agreement to be a completely integrated agreement.

7.  A writing intended to be a final and complete agreement between two parties is an integration.  *Franklin v. White,* 493 N.E.2d 161, 166 (Ind. 1986). Indiana law explains that:

> In general, where the parties to an agreement have reduced the agreement to a written document and have included an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract.

*Truck City of Gary, Inc. v. Schneider Nat. Leasing,* 814 N.E.2d 273, 278 (Ind. Ct. App. 2004).

8.  For language in a contract to qualify as an "integration clause," it must explain that all *prior* negotiations, representations, and communications are withdrawn, annulled, or merged into the final written agreement.  *Lawlis v. Kightlinger & Gray,* 562 N.E.2d 435, 439 n.1 (Ind. Ct. App. 1990).

9.  An integration clause does not always control whether or not the parties intended a writing to be a completely integrated agreement.  *Franklin,* 493 N.E.2d at 166.  A court must examine all of the relevant evidence to determine if the parties intended a writing to be totally integrated.  *Id.*

10.  However, even if the parties to a contract included an integration clause, the parol evidence rule does not prohibit consideration of extrinsic

-12-

evidence:  (a) to show that fraud, unintentional misrepresentation, or mistake led to formation of the contract; (b) to show the nature of the consideration supporting a contract; (c) to apply the terms of the contract to its subject matter; and (d) to uncover the circumstances under which the parties entered into the written contract.  *Millner v. Mumby,* 599 N.E.2d 627, 629 (Ind. Ct. App. 1992).

11.  When a determination has been made by a court that there was no integration, a different set of rules apply.  Under those circumstances, parol evidence may be admitted to supply an omission in the terms of the contract. *Malo v. Gilman,* 379 N.E.2d 554, 557 (Ind. Ct. App. 1978).

12.  Additionally, it is important to note that the Seventh Circuit has explained that the initial decision of whether or not the parties intended a complete integration is a question of law for the Court.  *Utica Mut. Ins. Co. v. Vigo Coal Co., Inc.,* 393 F.3d 707, 714 (7th Cir. 2004).  But, once the Court has determined that the agreement was not a complete integration, "the case go[es] to the jury . . . for a determination, based on extrinsic evidence as well as the written contract–based in short on all relevant, admissible evidence–of what the contract really means."  *Id.*

13.  In this instance, there is ample evidence to demonstrate that the parties did not intend a complete integration.  There was no integration clause. Digitech has been unable to point to any language in either the Product/ Services Agreement or the Business Associate Agreement that expressed an intention to withdraw, annul, or merge all prior negotiations, representations,

and communications into the Final Agreement.  Neither the paragraph entitled

"*Primacy*" in the Business Associate Agreement nor Section VI-A in the

Product/Services Agreement contain language tantamount to an integration

clause.

14.  Additionally, language in the Product/Services Agreement specifically

references "other specifications and documentation" supplied by Digitech.

Specifically, it provides:

> Subject to the terms and conditions set forth herein, Digitech
> hereby grants [Trans-Care] a non-exclusive, non-transferable
> license to use the Software.  DIGITECH represents and warrants
> that the Software shall function as designed in accordance with
> this Agreement (including any Riders hereto) and the specifications
> and documentation supplied by DIGITECH in all material respects.

(Exhibit 1, ¶ III-A)).

15.  Given the reference to writings outside of the Product/Services

Agreement, and given the fact that Digitech drafted the agreement, this is

additional substantial evidence that Digitech did not intend a complete

integration.

16.  Finally, extrinsic evidence clearly demonstrates that Trans-Care did

not intend a complete integration.  After the Product/Services Agreement and

the Business Associate Agreement's effective date of May 8, 2006, Trans-Care

submitted a Purchase Order that unambiguously incorporates the Formal

Proposal, including the 90-day satisfaction guarantee.  Trans-Care's actions

reveal an intention to include the 90-day satisfaction guarantee as an essential term of the parties' agreement.[3]

17.  In light of the fact that there was no integration clause or substantial evidence to suggest that the parties did not intend a complete integration, the Court determined that a trial must be conducted to determine what the contract means based on all admissible evidence, including the writings and extrinsic evidence.

18.  Under Count III of its Counterclaim, Trans-Care asserts a claim for breach of implied warranty of fitness for a particular purpose.  This claim is controlled by Indiana Code 26-1-2-315, which states as follows:

> Where the seller at the time of contracting has reason to know any particular purpose of which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under IC 26-1-2-316, an implied warranty that the goods shall be fit for such purpose.

19.  When there is a breach of a warranty, the purchaser must give the provider of the service both notice of the problem and a reasonable opportunity to cure or repair.  *Wagner Constr. Co., Inc. v. Noonan,* 403 N.E.2d 1144 at 1150 (Ind. Ct. App. 1980).

---

[3]Even if the Court were to conclude that the parties intended a complete integration, Indiana law still permits the use of extrinsic evidence to demonstrate that fraud, unintentional misrepresentation, or mistake led to formation of the contract.  Here, Trans-Care has provided extrinsic evidence (in the form of the written Formal Proposal, deposition testimony, and a Purchase Order) that supports its argument that it was operating under the assumption that a 90-day satisfaction guarantee was a part of the parties' agreement.

## Decision

This is a case of disputes between two honest business entities.  It is clear that in the course of soliciting Trans-Care's business, Digitech forwarded a Formal Proposal which included a ninety (90) day "Satisfaction Guaranteed" provision.  This was, in fact, an inducement for Trans-Care to enter into further negotiations.  The testimony and exhibits before the Court demonstrate that negotiations occurred on both sides and that the terms of the Formal Proposal continued to be discussed and modified.  Digitech did draft the document which became the Final Agreement between the parties.  That document did not contain the "Satisfaction Guaranteed" warranty previously discussed by the parties.  It did contain certain concessions concerning payment for the first three months of the Final Agreement, and other concessions which amounted to something less than a "Satisfaction Guaranteed" warranty.

Trans-Care had ample opportunity to review the Final Agreement prior to executing it.  In fact, Trans-Care drafted a Purchase Order with somewhat different terms, which it sent back to Digitech in the same mailing that it returned the signed Final Agreement.  Had it desired to do so, Trans-Care could have refused to sign the Final Agreement until its Purchase Order had been considered by Digitech and incorporated into the Final Agreement.  Trans-Care did not do so.  The Final Agreement itself is not ambiguous and, therefore, Trans-Care is left with the benefit of a bargain that was not the same bargain as had been originally proposed by Digitech.  While this may be deemed by many to

be unfair, and may even be considered sharp business practice, this Court is not allowed under Indiana law to fashion a "fairer" contract between the parties.  The Court must enforce the Final Agreement, as written.

The Final Agreement does contain a section addressing what warranties are offered under the Agreement.  The "Satisfaction Guaranteed" warranty is not within those warranties.  The warranty provides only that the *software* will work as represented.  The software did function and allowed billing and dispatch to occur.  The fact that after the "go live" date the software was somewhat more cumbersome and did not work perfectly does not amount to a breach of warranty.  Although there were numerous failures, those failures can be attributed to a large number of causes.  Some of the failures were due to the lack of necessary hardware.  The errors which occurred are described as haphazard and inconsistent.  The testimony about these "crashes" establishes that on most occasions crashes were unable to be reproduced by the parties after they were reported.  Based on the testimony before the Court, crashes which cannot be reproduced are usually the fault of hardware problems or difficulties in the interfaces between the various levels of software in the operating systems.  The burden of proof in this case is upon Trans-Care to show that the modules provided were not marketable or fit for their intended purpose, and that the software did not function.  It has not proven by a preponderance of the evidence that the failures which occurred were due to a defect in the software itself.

Therefore, Digitech prevails on its Complaint, and Trans-Care fails with respect to its Counterclaim.  The Court is unable to determine the precise amount of damages in this case because there are currently no computations of interest or attorney's fees as required under the Final Agreement.  If the parties are unable to reach an agreement as to the proper amount of damages within thirty (30) days from the date of this entry, the matter will be set for a **HEARING ON DAMAGES** before Magistrate Judge Hussmann on **THURSDAY, OCTOBER 15, 2009**, at 10:00 a.m., Terre Haute time (EDT), in the Courtroom of the Federal Building in Terre Haute, Indiana.

**SO ORDERED.**

**Dated:**  August 20, 2009

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Jeffry Alan Lind
FLESCHNER, STARK, TANOOS & NEWLIN
jeff@fleschnerlaw.com

Mark Douglas Hassler
HUNT HASSLER & LORENZ, LLP
hassler@huntlawfirm.net